**PROLERIZED SCHIABO NEU COMPANY, Plaintiff,**

**v.**

**HARTFORD ACCIDENT AND INDEMNITY COMPANY and Certain Underwriters at Lloyd's London Market and London Insurance Companies, Defendants.**

Civil Action No. 94–4857.

United States District Court, D. New Jersey.

Dec. 31, 1997.

Jeffrey B. Gracer, Andrea L. Wolff, Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, NJ, for Plaintiff, Prolerized Schiabo Neu Co.

Michael F. O'Neill, Barbara C. Zimmerman, Donna Stephan-Nolan, Purcell, Ries, Shannon, Mulcahy & O'Neill, Bedminster, NJ, for Defendant, Hartford Acc. and Indem. Co.

Leonore C. Lewis, Tompkins, McGuire & Wachenfeld, Newark, NJ, Glenn M. Fjermedal, D'Amato & Lynch, New York City, for Defendants, Certain Underwriters at Lloyd's London Market and London Ins. Companies.

## OPINION

ORLOFSKY, District Judge.

In this insurance coverage dispute involving two adjoining pieces of land, Plaintiff, Prolerized Schiabo Neu Company, claims that it should be indemnified under insurance contracts with its primary insurance carrier, Defendant, Hartford Accident & Indemnity Company, for, among other things, money that Plaintiff spent to purchase a piece of property. Such a demand is not, on its face, presumptuous. However, Plaintiff has not disputed that this piece of property was worth what it paid, has appreciated in value, and, contemporaneously with the purchase, resulted in the receipt of additional revenue by Plaintiff of approximately $500,000. Given the undisputed facts of this case, as contained in the summary judgment record, considered in the light most favorable to the Plaintiff, I cannot see how Plaintiff has sustained any damages compensable under the relevant insurance policies of both its primary and excess insurance carriers in connection with its purchase of the property. Based upon the undisputed facts in the record, I conclude that the money spent by PSN was not damages within the meaning of the policies. Accordingly, I will grant Defendants' motions for summary judgment as to the claim for damages arising out of Plaintiff's purchase of Lot 18.

PSN also claims that it should be indemnified for damages which it cannot connect to events, either as an "occurrence", or a "wrongful entry or eviction" which took place during the term of the insurance policies in question. Because PSN has not established any connection between the damages for which it demands coverage and events which occurred during the relevant policy periods, it is not entitled to coverage of those damages.

For the reasons set forth below, the Defendants' motions for summary judgment will be granted.

## I. Facts and Procedural Background

Plaintiff, Prolerized Schiabo Neu Company ("PSN"), is a joint venture with its principal place of business located in Jersey City, New Jersey. First Amended Complaint ¶ 3 (dated Sept. 12, 1997) (hereinafter Amended Compl.).[1] Beginning in approximately 1967, PSN has operated a metal recycling business in Jersey City, New Jersey. *Id.* at ¶ 25. The most significant aspect of PSN's metal recycling business involves the shredding of automobiles. *Id.* After the removal of the metallic portions of the shredded automobile, the material remaining, the automobile shredder residue ("ASR"), is essentially waste. *Id.; see also* Certification of Andrea L. Wolff (dated Sept. 25, 1997) (hereinafter Wolff Certif.), Exh. D at 2 (noting that for some period only ferrous metals were removed for recycling). ASR is a sponge-like material which absorbs water. *See* Wolff Certif., Exh. A at 6 (as modified by Letter from Barbara C. Zimmerman (dated Aug. 15, 1997)), Exh. D at 5. The effect of the deposit of ASR on realty is disputed by the parties. *Compare* Wolff Certif., Exh. A at 7–10 (concluding that the placement of ASR does not impair the ability to develop land and that removal of ASR returns land to pre-deposit condition) with Wolff Certif., Exh. D at 5–10 (concluding, *inter alia,* that "ASR is not suitable as a load-bearing subsurface base" upon which permanent structures may be constructed and that the "presence of the ASR affects many important properties of that land area").

Coinciding with the beginning of its metal recycling business, PSN began to deposit ASR on property known as Block 1507, Lot 7 ("Lot 7") which was then owned by one of the partners in the PSN joint venture, and eventually owned by PSN itself. Joint Final Pre-Trial Order at 4 (dated Dec. 5, 1997); Certification of Barbara C. Zimmerman (dated Sept. 15, 1997) (hereinafter Zimmerman Certif.), Exh. E.

Bordering Lot 7 to the south and west is a piece of property, Block 1507, Lot 18 ("Lot 18"), which was owned by the United New

---

**1.** The joint venturers are Hugo Neu Corporation, Proler Steel Corporation, and Schiavone–Bono-   mo Corporation.

Jersey Railroad and Canal Company until March 31, 1976. *See* Zimmerman Certif, Exh. K. At some point, PSN inadvertently began to deposit ASR on Lot 18. Amended Compl. at ¶ 26. It is the timing and extent of the placement of ASR on Lot 18, in particular, whether the placement of ASR on Lot 18 occurred during the periods of any of the insurance policies written by the Defendants, and the extent of any such placement, that comprises the centerpiece of this litigation. *Compare, e.g.,* Wolff Certif., Exh. B at 2–3 with Zimmerman Certif., Exh. I at 10; Joint Final Pretrial Order at 15 with *id.* at 16. On March 31, 1976, Lot 18 was acquired by Consolidated Rail Corporation ("Conrail") from the trustee in bankruptcy of the United New Jersey Railroad and Canal Company. *See* Zimmerman Certif., Exh. K.

Apparently all was well until April 14, 1987. On that date, Conrail sent Jay A. Zimmern ("Zimmern"), then General Manager of PSN, a letter claiming that "pulverized rubber products and metal have been spread over a portion of [Conrail's] property." Zimmerman Certif., Exh. H. The letter indicated that "unless [PSN] arrange[s] to have these materials removed from our property within twenty (20) days of the date of this letter, we will have no alternative but to take the legal actions necessary to have [PSN] accomplish this." *Id.*

Soon after receiving the Conrail letter and without first consulting its insurance broker or insurance carrier, *see* Joint Final Pretrial Order at 5, PSN responded that it would immediately begin to remove the ASR, but that the removal process would take longer than the twenty days allotted by Conrail. Also, PSN indicated its interest in purchasing Lot 18 from Conrail. *See* Zimmerman Certif., Exh. I.

Between May and November 1987, PSN removed approximately 57,000 tons of ASR from Conrail's property, expending approximately $1.9 million to do so. Amended Compl. at ¶ 28; Joint Final Pre–Trial Order at 5; Zimmerman Certif., Exh. Y (noting

removal of approximately 51,000 gross tons at total cost of $1,881,025.80).[2] Eventually on May 1, 1991, in lieu of removing the remaining ASR from Lot 18, PSN purchased Lot 18 from Conrail at a cost of approximately $1.6 million. Amended Compl. at ¶ 29; Zimmerman Certif., Exh. C at 246; *but see* Zimmerman Certif., Exh. V at 1, 6, 8 (indicating price of $1.5 million).

Contemporaneous with the sale of Lot 18, PSN sold an easement across Lots 7 and 18 to Tropicana or TPI Urban Renewal Corporation for $503,615.70. *See* Zimmerman Certif., Exh. C at 256–59, Exh. U. Tropicana had been negotiating with Conrail to develop property further to the south and west of Lot 18. *See* Zimmerman Certif., Exh. T at 170–72, Exh. U. The easement was necessary in order for Tropicana to have access to Linden Avenue, the main road into the area. *Id.*

Under various consecutive policies (the "Hartford policies"), Defendant, Hartford Accident & Indemnity Company ("Hartford"), a Connecticut corporation, provided, *inter alia,* comprehensive general liability insurance and personal injury liability insurance to PSN, or its predecessor, from July 1, 1970 until October 1, 1975. *See* Zimmerman Certif., Exh Z1–Z6. Under various policies (the "Lloyd's Policies"), Defendants, Certain Underwriters at Lloyd's London Market and London Insurance Companies (the "London Insurers"),[3] provided excess liability coverage to PSN from July 15, 1970 until July 29, 1976, with a short intervening period during which no policy was in force. *See* Certification of Glenn M. Fjermedal (dated Sept. 15, 1997) (hereinafter Fjermedal Certif.), Exh. A–E; *but see* Fjermedal Certif. at ¶ 2; Joint Final Pretrial Order at 10.

Shortly after completing its efforts to remove the ASR from Lot 18, PSN notified its insurance broker, Frenkel & Co., of Conrail's claim, and its expenditures to date to satisfy Conrail's demands. *See* Zimmerman Certif., Exh Y. In early December, 1987, Hartford was notified of the claim and on October 17, 1988, Hartford advised that it failed to see a

---

**2.** A "short ton" is 2,000 pounds, and a gross or "long" ton is 2,240 pounds.

**3.** For a helpful description of the workings of the English insurance and reinsurance market, see *Lowsley–Williams v. North River Ins. Co.,* 884 F.Supp. 166, 167–168 (D.N.J.1995).

loss covered by its policies. *See* Joint Final Pretrial Order at 5–6. Despite having spent approximately $1.9 million in removing ASR from Conrail's property, well above the limit of coverage provided in the Hartford policies, *see id.* at 7–8, PSN did not provide the London Insurers with notice of its claim under Lloyd's excess insurance policies until October 12, 1994, nearly seven years after Conrail first demanded that the ASR be removed from its property and PSN had spent nearly $1.9 million to do so, and nearly three years after PSN had purchased Lot 18. *See id.* at 6.

On that date, PSN filed a Complaint in this Court against Hartford and the London Insurers seeking, *inter alia,* a declaration that "all sums expended by PSN to remove ASR from Conrail's property and to purchase the Conrail property are covered under the property damage provisions" of the Hartford and Lloyd's policies or, alternatively, the personal injury provisions of the policies. Complaint at ¶¶ 33(a), 39(a) (dated Oct. 12, 1994).

On May 22, 1996, PSN moved for partial summary judgment on a single issue: whether the Personal Injury Liability ("PIL") endorsement of the policy provided coverage to PSN for "wrongful entry" for its inadvertent deposit of ASR on an adjoining landowner's property. Hartford cross-moved for partial summary judgment on the grounds that the PIL endorsement did not provide coverage for "wrongful entry" for PSN's unauthorized deposit of ASR on Conrail's property, and that PSN's suit was barred by New Jersey's six-year statute of limitations on contract actions. The Court denied PSN's motion and Hartford's cross-motion for partial summary judgment on the PIL "wrongful entry" coverage issue without prejudice, pending the completion of discovery. The Court also denied Hartford's cross-motion for partial summary judgment on statute of limitations grounds, finding that PSN's cause of action accrued less than six years prior to commencement of the action. *See Prolerized Schiabo Neu Co. v. Hartford Accident &*

*Indem. Co., et al.,* Civil Action No. 94–4857, Opinion at *passim* (dated May 22, 1996).

Several months later, on August 14, 1996, PSN again moved and Hartford again cross-moved for partial summary judgment on the PIL "wrongful entry" coverage issue. I denied the cross-motions, finding that a decision on the PIL "wrongful entry" coverage issue at that time would amount to an improper "advisory opinion." *See Prolerized Schiabo Neu Co. v. Hartford Accident & Indem. Co., et al.,* Civil Action No. 94–4857, Opinion at 14 (dated Aug. 14, 1996) (noting that Court could not base summary judgment motion on existence of hypothesized, unproven facts).[4]

During the course of discovery in this action, PSN filed an Amended Complaint which refocussed the litigation on different time periods. Instead of the policies issued for the 1966 through 1972 period, PSN's allegations now address the period from 1970 though 1975. *Compare* Complaint at ¶¶ 7–12 with Amended Compl. at ¶¶ 7–12; *see generally* Memorandum in Support of PSN's Motion to Amend the Complaint 4 (dated Aug. 28, 1997).

Hartford and the London Insurers have now moved for summary judgment on all of PSN's claims for damages. The Court may exercise jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).

## II. Standard on Motion for Summary Judgment

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see, e.g., Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir.1996); *Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1219 n. 3 (3d Cir.1988), *cert. denied,* 490 U.S. 1098, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989); *Hersh v. Allen Prod. Co.,* 789 F.2d 230, 232 (3d Cir.1986); *Lang v. New York Life Ins. Co.,* 721 F.2d 118, 119 (3d Cir.1983).

---

**4.** Indeed, the "inadvertence" of PSN's deposit of ASR on Conrail's land is still a contested fact.

*See* Joint Final Pretrial Order at 4.

In deciding whether there is a disputed issue of material fact, the Court must view the underlying facts and draw all reasonable inferences therefrom in favor of the non-moving party. *See, e.g., Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir. 1995); *Hancock Indus. v. Schaeffer,* 811 F.2d 225, 231 (3d Cir.1987); *Meyer v. Riegel Prods. Corp.,* 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. dismissed,* 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor).

In deciding whether triable issues of fact exist, Rule 56(e) of the Federal Rules of Civil Procedure provides, in relevant part:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). The rule does not increase or decrease a party's ultimate burden of proof on a claim. Rather, "the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Anderson,* 477 U.S. at 255–56.

Under the rule, a movant must be awarded summary judgment on all properly supported issues identified in its motion, except for those for which the non-moving party has provided evidence to show that a question of material fact remains. Put another way, once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, for example, with affidavits, which may be "supplemented ... by depositions, answers to interrogatories, or further affidavits," *id.,* "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson,* 477 U.S. at 247–48 ("by its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion ...; the requirement is that there be no *genuine* issue of *material* fact") (emphasis in original).

What the non-moving party must do is "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Lujan v. National Wildlife Fed.,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) ("[t]he object of [Rule 56(e)] is not to replace conclusory allegations of the complaint ... with conclusory allegations of an affidavit"); *Anderson,* 477 U.S. at 249; *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992) ("to raise a genuine issue of material fact ... the [non-moving party] need not match, item for item, each piece of evidence proffered by the movant," but rather must exceed the "'mere scintilla' threshold"), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

Finally, it should be noted that "summary judgment is no longer a disfavored procedural shortcut and may present the district court with the first opportunity to dispose of meritless cases." *Id.* at 1362 (citations omitted). This is true even "in cases where motive and intent play leading roles." *Id.* Nonetheless, it is inappropriate on a motion for summary judgment for a court to resolve factual disputes and to make credibility determinations. *Id.* at 1363.

## III. Discussion

### A. Timing of ASR Deposits

Hartford's central contention in arguing for summary judgment is that the factual record developed during discovery shows that the vast majority of ASR was spread onto Lot 18 between April 1974 and April 1987. Hartford maintains that the evidence shows "only three small pockets of ASR encroaching upon the northern border of ... Lot 18" as of April 1974. While the final Hartford policy was not canceled until October 1, 1975, see Zimmerman Certif., Exh. Z6, and neither Hartford nor PSN has pointed to the existence of evidence regarding the state of PSN's encroachment onto Lot 18 as of that specific date, Hartford claims that the three pockets of ASR which had been deposited by April 1974 are not at all related to PSN's 1987 ASR removal costs. Brief of Defendant, Hartford, in Support of Summary Judgment 13–14 (dated Sept. 15, 1997) (hereinafter Hartford's Brief); Reply Brief of Defendant, Hartford, in Support of Summary Judgment 5–9 (dated Oct. 6, 1997) (hereinafter Hartford's Reply Brief).

At the outset, it should be noted that Hartford's argument is not that there was no encroachment prior to the termination of the last Hartford policy. Rather, it argues that there is no connection between PSN's 1987 removal costs and the limited encroachment which existed as of April 1974. PSN has responded, first, by showing encroachment prior to termination of the final Hartford policy. PSN's expert, Dr. Samuel W. Gowan, concluded that as of April 1974 there were three areas where ASR encroachment onto Lot 18 occurred. Wolff Certif., Exh B at 2 & Fig 3. Indeed, this conclusion does not appear inconsistent with that of Hartford's expert, Mr. R. Lee Steiner, who concluded that his review of aerial photographs "shows that three small areas in the immediate vicinity of the loop railroad have ASR on the Conrail property as of 1974." Wolff Certif., Exh. A at 10. In short, both parties agree that there is at least *some* encroachment onto Lot 18

during a policy period, *i.e.,* after July 1, 1970 and before October 1, 1975. *See* Zimmerman Certif., Exh. Z1, Z6; Hartford's Reply Brief at 7 (noting agreement between experts).[5]

In demonstrating that some ASR was deposited as of April 1974, PSN goes further and argues that its expert report shows that ASR was placed on railroad property as early as *1970*. *See* PSN's Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment 3 (dated Sept. 25, 1997) (hereinafter PSN's Memorandum of Law); *see also id.* at 7–9. For this proposition, PSN refers only to a letter from its expert commenting on the expert report prepared by Hartford's expert. *See* Wolff Certif., Exh. C. In the letter, Dr. Gowan states, without citation or elaboration, that:

> [Hartford's expert] inaccurately states, in their photograph review summary, that there is no evidence that ASR was placed on railroad property before 1972. This belies the extension of ASR across the boundary by at least 5/30/1970.

*Id.* However, this conclusion does not appear consistent with Dr. Gowan's original report which neither uses May 30, 1970, as a reference date, nor concludes that encroachment occurred as of this date.

Finally and perhaps most important, it does not appear that Dr. Gowan's report—which PSN relies upon to show where the ASR was with respect to boundary lines between Lots 7 and 18—was prepared by using an actual map of the boundary lines between those two lots. *See, e.g.,* Wolff Certif., Exh B at 1 (noting that report is based on aerial photographs and prepared with reference to observable physical features, not property boundary lines). At the very least, Dr. Gowan was aware that a meaningful and helpful comparison between maps based on physical features and measurements therefrom and maps based on surveyed property lines could be made. *See, e.g.,* Wolff Certif., Exh. E (Affidavit of Samuel W. Gowan, Ph.D.).

5. The parties do, however, dispute exactly how much ASR had been deposited on Conrail's property as of April 1974. *Compare* Wolff Certif., Exh A at 5, 10 (estimating that three areas of en- croachment constitute approximately 1,650 tons of ASR) with Wolff Certif., Exh. C (challenging methodology of estimation).

Perhaps recognizing these serious weaknesses in the factual evidence of encroachment prior to April 1974, beyond the three small areas discussed above, PSN addresses head-on Hartford's argument that no connection can be proven between the three small areas of encroachment which occurred sometime before April 1974 and PSN's expenditures to remedy the more extensive encroachment which occurred up to April 1987, the date of Conrail's letter to PSN. PSN's response is twofold. First, PSN argues offhandedly that the "[i]nsurers [cannot] conclusively demonstrate that none of the ASR removed in 1987 existed on Conrail property in 1974." PSN's Memorandum of Law at 6.

While PSN does not explain in any detail why it is the Defendants' burden to *disprove* coverage, PSN's second argument does attempt to do so. PSN asserts that its disposal of ASR was a "process" and a "single indivisible occurrence, resulting in a single indivisible injury." PSN's Memorandum of Law at 5–6. This means, PSN argues, that the policies issued by Hartford and the London Insurers were "triggered." *Id.* Thus, PSN concludes, Hartford must "respond to any claims presented, subject to its right to initiate allocation proceedings." *Id.* at 6.

■ However, this is simply not a "continuous trigger" case, and to characterize it as such is to lose sight of the rationale behind that theory. The seminal New Jersey case on the "continuous trigger" theory is *Owens–Illinois, Inc. v. United Insurance Co.*, 138 N.J. 437, 650 A.2d 974 (1994).[6] A brief examination of that case and a comparison to the case at hand illustrate that the cause of the alleged injury to Conrail's land, the placement of ASR on it, is neither progressive nor indivisible, and that the "benefits" of the "continuous trigger" *theory*, as articulated by the New Jersey Supreme Court in *Owens–Illinois*, should not be available to PSN. Thus, the burden of allocating damage to particular policy periods does not shift to Hartford, but rather would remain PSN's to prove at trial. Indeed, because this is not a "continuous trigger" case, it is PSN's burden to prove damages as a result of an "occurrence" or "wrongful entry" within a policy period.

In *Owens–Illinois*, the New Jersey Supreme Court answered the question of whether and when the "occurrence" policies,[7] as opposed to "claims made" policies, issued by particular insurers were "triggered." That is, did "the event or events that under the terms of a policy determine whether a policy must respond to a claim in a given set of circumstances" occur, and during which insurance company's policy did those events occur? *Id.* at 447–8, 650 A.2d 974. In answering this question, the New Jersey Supreme Court adopted the "continuous trigger" theory and held that:

> when progressive indivisible injury or damage results from exposure to injurious conditions for which civil liability may be imposed, courts may reasonably treat the progressive injury or damage as an occurrence within each of the years of a [comprehensive general liability] policy.

*Id.* at 479, 650 A.2d 974. That is, "the date of the occurrence should be the continuous period from exposure to manifestation." *Id.* at 450, 650 A.2d 974 (discussing *Keene Corp. v. Insurance Co. of N. Am.*, 667 F.2d 1034 (D.C.Cir.1981), *cert. denied*, 455 U.S. 1007,

---

**6.** The parties have assumed correctly that the law of the state of New Jersey applies to the interpretation of the insurance policies at issue. *See Diamond Shamrock Chem. Co. v. Aetna Casualty & Surety Co.*, 258 N.J.Super. 167, 197–199, 609 A.2d 440 (App.Div.1992) (choosing between law of New York and New Jersey), *certif. denied*, 134 N.J. 481, 634 A.2d 528 (1993).

**7.** The policy language for the definition of "occurrence" analyzed in *Owens–Illinois* matches verbatim, except for emphasis of defined terms, the language of the Hartford policies from 1973 to 1975. *Compare Owens–Illinois*, 138 N.J. at 447, 650 A.2d 974 with Joint Final Pretrial Order

at 8; Zimmerman Certif., Exh. Z5 at 2 (defining occurrence as "an accident including *continuous* or repeated exposure to conditions which results in *bodily injury* or *property damage* neither expected nor intended from the standpoint of the *insured* "). The definition of "occurrence" provided in the Hartford policies covering the period from 1970 to 1973 is: "an accident, including injurious exposure to conditions, which results, during the policy period, in *bodily injury* or *property damage* neither expected nor intended from the standpoint of the *insured.*" *See, e.g.*, Zimmerman Certif., Exh. Z1 at 2 (emphasis in original).

102 S.Ct. 1644, 71 L.Ed.2d 875 (1982)). Consequently, "[b]ecause the 'trigger' is a continuous process, any insurer whose policy was in effect at any point in this process could be liable for the injury under this theory." *J.T. Baker v. Aetna Casualty & Surety Co.,* 1996 WL 451316, *9 (D.N.J. Aug.5, 1996).

What the "continuous trigger" cases have in common is an injury which begins with some exposure to a harmful substance or condition, which is followed by some period of latency or "exposure in residence," and finally terminates in some manifestation of injury. *See, e.g., Owens–Illinois,* 138 N.J. at 451, 650 A.2d 974 (noting "conceptual underpinning of the theory); *Keene,* 667 F.2d at 1040 (noting that occurrence "may take place substantially before the manifestation of the ultimate injury" and that a disease "may develop during subsequent policy period"); *see also id.* at 1044–46 (discussing rationale for rule of continuous trigger); *id.* at 1058 (Wald, J. concurring in part). This is the sense in which the injury is "progressive:" its tendency to develop over a long period of time before becoming visible, noticeable, or felt. *See Owens–Illinois,* 138 N.J. at 455–56, 650 A.2d 974 (noting delay between exposure and manifestation of harmful effects); *see also Pittston Co. v. Allianz Ins. Co.,* 905 F.Supp. 1279, 1299 (D.N.J.1995) (noting that "the heart of the [theory] is that the damage is ongoing" and that its cause is "continuous and progressive"), *overruled on other grounds,* 124 F.3d 508 (3d Cir.1997); *Chemical Leaman Tank Lines, Inc. v. Aetna Casualty & Surety Co.,* 89 F.3d 976, 995 (3d Cir.), cert. denied, —— U.S. ——, 117 S.Ct. 485, 136 L.Ed.2d 379 (1996); *Gottlieb v. Newark Ins. Co.,* 238 N.J.Super. 531, 535, 570 A.2d 443 (App.Div.1990).

It is quite clear that what the New Jersey Supreme Court was addressing in *Owens–Illinois* was the difficulty of isolating the exact events which caused an end result and, consequently, the difficulties in determining the exact time period in which the end result was caused. In analyzing the history of the law of New Jersey on the question of when an injury requires indemnity, the New Jersey Supreme Court quite self-consciously and "in the face of doubtful scientific premises [adapted] [New Jersey's] law to the uncertainties of medical causation." *Owens–Illinois,* 138 N.J. at 458, 650 A.2d 974. The court continued:

> So too here, our resolution of the issues is necessarily imperfect. Our concepts of legal causation were developed in an age of Newtonian physics, not of molecular biology. Were it possible to know when a toxic substance clicks on a switch that alters irrevocably the composition of the body and before which no change has "occurred," we might be more confident that occurrence-causing damage had taken place during a particular policy period. The limitations of science in that respect only compound the limitation of the law.

*Id.* at 458–59, 650 A.2d 974; *Astro Pak Corp. v. Fireman's Fund Ins. Co.,* 284 N.J.Super. 491, 499–500, 665 A.2d 1113 (App.Div.1995) (noting that continuous trigger theory was adopted in order to identify "point at which the law will say that injury requires indemnity" and that identification of single point in time is the antithesis of this approach for progressive indivisible injury), *certif. denied,* 143 N.J. 323, 670 A.2d 1065 (1995); *see also Lac D'Amiante Du Quebec, Ltee. v. American Home Assurance Co.,* 613 F.Supp. 1549, 1560–61 (D.N.J.1985) (policy language did not confine property damage to any particular point in time or phase in the damage process and injury was not complete upon act of installation of hazardous material), *vacated on other grounds,* 864 F.2d 1033 (3d Cir. 1988).

The injury caused by PSN's placement of ASR onto Conrail's land, however, was not progressive in this sense. Rather, the injury, the encroachment onto Conrail's land, occurred as soon as PSN inadvertently deposited ASR onto land which it did not in fact own. As an objective matter, this injury was in no sense difficult to isolate in time. And, the injury to that land objectively manifested itself immediately and discretely with each new deposit of ASR. That is, the injury and the "occurrence" transpired simultaneously and, consequently, there was no period of latency with respect to the damage to Conrail's land. That PSN repeated the same allegedly unintentional behavior over a period of time, by depositing ASR onto Conrail's

land on numerous occasions, thereby causing the ASR to accumulate, does not make the injury progressive in cause. Nor is the injury progressive in cause because more and more ASR accumulated over time. All these facts demonstrate is that PSN's conduct is accurately described as a *series* of instances of allegedly unintentional behavior, some of which may have occurred during the periods of the Hartford policies.

In considering the requirement that the injury be indivisible, I conclude that the injury caused by PSN's placement of ASR onto Conrail's land was not indivisible in the sense described by *Owens–Illinois*. By indivisible, the New Jersey Supreme Court meant that the injuries which are embraced by the continuous trigger theory cannot be easily allocated to any particular time period, or insurance policy, because the cause of the injury cannot be isolated with any degree of mathematical or scientific nicety. *See Owens–Illinois,* 138 N.J. at 474–75, 650 A.2d 974. By indivisible, the New Jersey Supreme Court meant that the specific cause of a continuous harm could not be parceled out with any scientific accuracy such that it could be said, for example, that a certain percent of the ultimate injury was caused during the first year of exposure. For this reason, the *Owens–Illinois* court opted for the second-best solution of prorating the time on the risk of each insurer and the degree of risk assumed under a particular insurance contract. *Id.* at 475–76, 650 A.2d 974.

Here, it is quite obvious that the cause of the harm—the harm being the encroachment onto Conrail's land—can, as an objective matter, be divided up over time. For example, if PSN could prove that one-half of the ASR ultimately removed from Conrail's land was deposited during the periods of the Hartford policies, then Hartford would be responsible for that portion of PSN's damages.

In short, PSN's apparent choice not to insure itself for the period after October 1, 1975, is no reason to "shoehorn" this case into the continuous trigger theory mold just to provide coverage for an otherwise uninsured or self-insured injury. *See, e.g., Owens–Illinois,* 138 N.J. at 451–52, 650 A.2d 974 (presumption of maximizing coverage as an end in and of itself is "an uneven principle" resembling "judicial legislation"); *Uniroyal, Inc. v. Home Ins. Co.,* 707 F.Supp. 1368, 1392 (E.D.N.Y.1988) (discussing effect of failure to insure on allocation among insurers and insured). PSN could not have reasonably believed that simply having committed the first in a long series of allegedly unintentional acts while Hartford was "on the risk" would entitle it to insurance forever. While the continuous trigger theory remains useful and, indeed, quite powerful, it should not be applied where it is inappropriate to do so. *See Owens–Illinois,* 138 N.J. at 456, 650 A.2d 974 (noting that continuous trigger theory was applicable in asbestos case where "no one suggest[ed] that the process was anything but continuous"); *Hartford Accident & Indem. Co. v. Aetna Life & Casualty Co.,* 98 N.J. 18, 28–29, 483 A.2d 402 (1984) (rejecting "exposure" theory because party presented no evidence that harm was cumulative and progressive and noting that "some diseases . . . are cumulative and progressive, but others are not"); *J.T. Baker,* 1996 WL 451316, *10 (noting that *Hartford* "limits [use of the continuous trigger theory] when the evidence supporting its application is not present in the record"); *cf. Koppers Co., Inc. v. Aetna Casualty & Surety Co.,* 98 F.3d 1440 (3d Cir.1996) (applying Pennsylvania law and noting effect of introduction of evidence that property damage was continuous, progressive, and indivisible).[8]

Having concluded that PSN cannot avail itself of the continuous trigger theory to

---

8. Because the continuous trigger theory is not available to PSN, as the injury was neither progressive, continuous, or indivisible, at a trial, as with any insurance policy, it would have been PSN's burden to prove: 1) that an "occurrence" took place or the offense of "wrongful entry or eviction" was committed, *see* Joint Final Pretrial Order at 9, during a policy period; 2) that the "occurrence" or the offense of "wrongful entry or eviction" caused damage, either property damage or personal injury; 3) the amount, if any, PSN was legally obligated to pay as damages as a result of the property damage or personal injury. *See generally Hartford,* 98 N.J. at 26, 483 A.2d 402 (insured's burden to show that underlying claim falls within the terms of the policy). In light of my holdings below, however, the burdens of proof at trial are not relevant.

show an entitlement to indemnification for *all* of its 1987 ASR removal costs and noting the agreement between PSN and Hartford that there was some ASR encroachment prior to April 1974, it remains to be decided whether Hartford is entitled to summary judgment on the question of whether PSN can show any connection between the 1987 ASR removal costs, *i.e.*, ASR removed from Conrail's land in 1987, and ASR deposited onto Conrail's land prior to October 1, 1975. In support of it motion, Hartford claims that: 1) PSN's general manager, Jay Zimmern, testified that the 1987 ASR removal costs relate to ASR removed from the southern portion of Lot 18, not the three small areas of encroachment along the northern border of Lot 18; and 2) PSN cannot prove when the ASR was spread onto its property. *See* Hartford's Brief at 13–14; Hartford's Reply Brief at 7–8.[9]

In response to Hartford's first argument, PSN argues that Zimmern only indicated generally the areas from which ASR was removed. PSN's Memorandum of Law at 8. This does nothing to satisfy PSN's burden to respond to a properly supported motion for summary judgment; that Zimmern was only estimating which pockets of ASR were removed in 1987 does not show that PSN could prove any connection between 1987 removal costs, *i.e.*, ASR removed from Conrail's land in 1987, and pre-termination encroachment, *i.e.*, an "occurrence" or offense or wrongful entry of eviction which took place during a policy period.

In response to Hartford's second point, PSN's response is non-existent: it has not adduced a "scintilla" of evidence to show a connection between its 1987 removal costs

and the ASR which existed on Conrail's property prior to October 1, 1975. What PSN seems to have done instead is to cull from Hartford's Statement of Undisputed Facts (dated Sept. 15, 1997) in an attempt to dredge up any factual dispute and, hopefully, thereby survive summary judgment. However, the factual disputes which PSN hopes to reserve for trial are immaterial to the question of whether it can meet its burden of proof demonstrating a connection between removal costs, *i.e.*, ASR removed in 1987, and encroachment prior to termination of the final insurance contract with Hartford. On that score, PSN registers nothing. Summary judgment for Hartford on the question of whether PSN's removal expenses relate to an "occurrence" or offense of "wrongful entry or eviction" which took place during one of the Hartford policy periods is therefore appropriate.[10]

### B. Nature of Alleged Damages to PSN

Hartford's secondary contentions, joined, once again, by the London Insurers, relate to the nature of the "damages" allegedly sustained by PSN in removing what ASR from Lot 18 which they did clean up, and in purchasing Lot 18 from Conrail.

First, Hartford separates the costs PSN sustained in cleaning up approximately 57,-000 tons of ASR into: 1) the costs to remove the 57,000 tons from Lot 18; and 2) the costs of re-disposing of the 57,000 removed tons into a landfill. Hartford argues that PSN was only legally obligated as a result of Conrail's threat of legal action to remove the 57,000 tons of ASR from Lot 18, but not

---

9. The latter method—pointing out that the non-moving party cannot meet its burden of proof—is, of course, available as a way of supporting a motion for summary judgment. *See, e.g., see Celotex*, 477 U.S. at 325 (moving party's burden on summary judgment may be discharged by pointing out to the district court that "there is an absence of evidence to support the nonmoving party's case").

10. Hartford's motion for summary judgment was joined by the London Insurers. *See* Brief in Support of Defendants' Joinder in Hartford's Motion for Summary Judgment 1–2 (dated Sept. 15, 1997). In light of my holding that PSN has not met its burden of responding to Hartford's properly supported motion for summary judg-

ment on the issue of whether an "occurrence" or "wrongful entry or eviction" took place during a policy period and noting that the definition of "occurrence" in the Lloyd's policies requires "personal injury, property damage, or advertising liability during the policy period," *see, e.g.,* Fjermedal Certif., Exh. E at § 5, summary judgment is proper for any claim PSN has against the London Insurers relating to the 1987 ASR removal costs as, once again, there is no connection between damages sustained by PSN and events which took place during a period of the Lloyd's policies. Therefore, the London Insurers' motion for summary judgment will be granted.

legally obligated to re-dispose of the ASR. Hartford characterizes the costs to re-dispose of the 57,000 tons of ASR as "business expenses." Therefore, Hartford argues, at most PSN can claim that it should be indemnified for only the removal costs, $1,881,025.80–$1,796,412, or $84,607.40. See Zimmerman Certif., Exh. Y.

Second, Hartford argues that PSN voluntarily assumed responsibility in removing ASR from Lot 18. This, Hartford claims violated one of the clauses of the insurance contract which provides that PSN:

> shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.

See, e.g., Zimmerman Certif., Exh. Z5 at § 4(c). In light of my finding that summary judgment is appropriate as to PSN's 1987 removal costs, I need not address Hartford's arguments.

Finally, Hartford argues that the purchase price of Lot 18, $1.5 or $1.6 million, cannot be considered damages under the Hartford policies because PSN has not sustained any meaningful loss in purchasing the property. Not only did PSN receive a piece of property allegedly worth what it paid, but also PSN has received a large unrealized gain on the property, in the form of the property's appreciation, and because owning both Lots 7 and 18 enhances the value of the two. Furthermore, PSN has realized an additional gain of over $500,000 as a result of its purchase of the property because, contemporaneously with its purchase of Lot 18 from Conrail, a third-party paid PSN for an easement across PSN's land, including Lot 18.

In support of the argument that purchase of the property did not result in any losses to PSN, Hartford had Lot 18 appraised. See Zimmerman Certif., Exh. W. The appraisal's estimate of the market value of Lot 18, as of December 21, 1992, the date on which PSN was deeded the land, is $1,586,000. Id. at 3. The appraisal's estimate of Lot 18's market value as of March 12, 1997 is $2,221,000. Id. at 3, 23–25 (noting effect of ASR on value of property).[11] PSN has not rebutted these estimates or suggested their inaccuracy. Nor has PSN suggested that it did not actually receive, at the same time that it purchased Lot 18, approximately $500,000 in exchange for an easement across, inter alia, Lot 18.

■ The amounts paid to Conrail by PSN were not paid as damages within the meaning of any of the Hartford or Lloyd's policies. This is true just as much for Hartford's 1970 to 1973 policies wherein damages with respect to property damage coverage are defined to "include[] ... damages for loss of use of property resulting from property damage," Joint Final Pretrial Order at 9, as it is true for the Hartford policies which define "damages" with respect to personal injury liability coverage as "only those damages which are payable because of personal injury arising out of an offense to which this insurance applies." Zimmerman Certif., Exh. Z3. Similarly this is true for Hartford's 1973 through 1975 policies and the Lloyd's policies. To compensate PSN for the $1.5 or $1.6 million paid to Conrail, when it appears that what PSN received in exchange was worth approximately that amount, and has turned out to be a prudent investment (i.e., the land has appreciated in value, as a direct and not fortuitous result of the purchase, resulted in additional revenue of approximately $500,000 and eventually enhanced the value of the combined Lot 18 and Lot 7 parcel by $325,000),[12] would result in a windfall for PSN. It cannot have its cake and, turning to its insurers, eat it too. Summary

---

11. Hartford's appraisers also estimated that the concentration of Lots 7 and 18 under PSN's common ownership enhanced the value of both properties by $325,000. See Hartford's Brief at 7–8; Zimmerman Certif., Exh. W at 3, 106.

12. Assuming a purchase price of $1.6 million in May 1991, an estimated value of $2.221 million in March 1997, plus an additional $325,000 as a result of the enhancement in value to Lots 7 and 18, plus the $503,615.70 easement, it would appear that PSN's total investment grew at a rate of approximately 11.7% per year. The notion that PSN should be compensated by its insurance carriers on top of this return on its "investment" makes this a case perhaps more about "chutzpah" than anything else. On the venerable tradition of the use of Yiddish in judicial opinions, see Hon. Alex Kozinski and Eugene Volokh, Lawsuit, Shmawsuit, 103 Yale L.J. 463 (1993).

judgment in favor of Hartford and the London Insurers on PSN's claim that the amount spent to purchase Lot 18 is therefore appropriate.[13]

### C. Further Arguments of the London Insurers

The London Insurers, in addition to joining Hartford's arguments, make two further arguments. First, the London Insurers claim that PSN failed to provide notice within a reasonable period of time, as provided for by the Lloyd's Policies, and that the London Insurers suffered "appreciable prejudice" as a result of PSN's delay in providing notice. The Lloyd's Policies provide that:

> Whenever the Assured has information from which the Assured may reasonably conclude that an occurrence covered hereunder involved injuries or damages which, in the event that the Assured should be held liable, is likely to involve this policy, notice shall be sent as stated [elsewhere in this policy] as soon as practicable, provided, however, that failure to give notice of any occurrence which at the time of its happening did not appear to involve this policy but which, at a later date, would appear to give rise to claims hereunder, shall not prejudice such claims.

*See, e.g.,* Fjermedal Certif., Exh. D at § G, Exh. E at § G.

Second, the London Insurers argue that PSN violated the "Assistance and Cooperation" clause of the Lloyd's policies. That clause provides:

> Underwriters shall not be called upon to assume charge of the settlement or defence [sic] of any claim made or suit brought or proceeding instituted against the Assured, but Underwriters shall have the right and shall be given the opportunity to associate with the Assured or the Assured's Underlying Insurers, or both, in the defence [sic] and control of any claim, suit or proceeding relative to an occurrence where the claim or suit involves or appears reasonably likely to involve Underwriters, in which event the Assured, the

Underlying Insurers and Underwriters shall co-operate [sic] in all things in the defence [sic] of such claim, suit or proceeding.

*See, e.g.,* Fjermedal Certif., Exh. A at § D, Exh. C at § H. The London Insurers argue that PSN's violation of the provision prejudiced the London Insurers. In light of my finding that PSN has not sustained its burden of showing a connection between its 1987 ASR removal costs and an occurrence or "wrongful entry or eviction" during either the Hartford or Lloyd's policies, I need not consider whether PSN's late notice to the London Insurers resulted in appreciable prejudice or whether there was prejudice as a result of any violation of the "Assistance and Cooperation" clause of the Lloyd's policies.

### IV. Conclusion

Accordingly, for the reasons set forth above, the Defendants' motions for summary judgment are granted. The Court will enter an appropriate order.

---

**13.** This is not to suggest that any time an insured mitigates damages by purchasing a piece of property from a third party that the sum expended cannot be characterized as damages. There are likely to be many such cases. This, however, is not one of them.